## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

RAMONA TORRES,

       Plaintiff,

v.                                                            No. Civ. 11-358 LH/RHS

CITY OF ALBUQUERQUE,

       Defendant.

### MEMORANDUM OPINION AND ORDER

On February 22, 2012, Defendant City of Albuquerque ("the City") filed a Motion for Summary Judgment and Memorandum of Law in Support (Doc. 20).  The Court, having considered Defendant's motion for summary judgment, the briefs, evidence, relevant law, and otherwise being fully advised, concludes that Defendant's motion should be granted.

## I.    FACTUAL BACKGROUND

Plaintiff Ramona Torres is female and employed by the City as a telecommunicator for the Aviation Department Communications Center.  (Def.'s Mot. for Summ. J. (Doc. 20), Undisputed Fact ("UF") ¶ 1; Pl.'s Resp. (Doc. 25), UF ¶ 29.)  She has been employed with the City since 1995 and at the Communications Center since 2000.  (Pl.'s Resp. (Doc. 25), UF ¶ 29.)  Female employees outnumbered the male employees by a ratio of about two-to-one at the Communications Center.  (*Id.*, Ex. B (Doc. 25-1) at 50.)  Four men, including Paul Willems, worked at the Communications Center.  (*Id.*)

Plaintiff's co-worker Paul Willems has a long history of hostility and conflict toward co-workers, supervisors, and police officers.  (*See* Def.'s Mot. (Doc. 20), UF ¶ 13; Pl.'s Resp. (Doc.

25), UF ¶¶ 30, 60.)  At various times in his employment, Mr. Willems had conflicts with all but two

of the female telecommunicators and supervisors with whom he worked.  (Pl.'s Resp. (Doc. 25), UF

¶ 60.)  Although he seemed to have a problem with authority figures, both male and female, he did

not have any conflicts with male telecommunicators who were his peers.  (*See id.*, Ex. D (Doc. 25-2)

¶ 31.)

Plaintiff and Mr. Willems were both, at times, supervised by Veronica Montano-Davis and

Greg Sanchez.  (Def.'s Mot. (Doc. 20), UF ¶ 9.)  Ms. Montano-Davis has knowledge of a number

of employees with whom Mr. Willems had conflicts, including seven females: Ms. Montano-Davis,

Sidney Sice, Jessica Dickman, Brenda Molina, Sybille Subiano, Laura Lee Sanchez, and Plaintiff;

and two males:  Greg Sanchez and Officer Todd Woodridge.  (*See id.*, UF ¶ 10.)  Ms. Montano-

Davis stated Mr. Willems had a terrible demeanor with his co-workers and was rude, verbally

demeaning, and loud.  (*Id.*, UF ¶ 11.)  She described him as a "bully."  (*Id.*, UF ¶ 12.)  According

to Greg Sanchez, Mr. Willems was "an equal opportunity antagonist" who had issues "across the

board with everybody," although he acknowledged that at some points he was having more issues

with Ms. Torres, or at times, more issues with Ms. Sanchez.  (*See* Def.'s Mot., Ex. C (Doc. 20-1)

at 50-51.)  Michelle Rallis, the Personnel Officer for the Aviation Department, also had several

interactions with Mr. Willems in which he was rude or insubordinate, but she thought "his bark was

louder than his bite."  (Pl.'s Resp. (Doc. 25), UF ¶¶ 89, 91 & Ex. F (Doc. 25-3) at 22.)

On November 8, 2007, Jessica Dickman, the Operations Manager, issued a directive to Mr.

Willems and another female telecommunicator, Sidney Sice, to attend mediation due to

communication problems that were causing an uncomfortable environment on the graveyard shift.

(Pl.'s Resp. (Doc. 25), UF ¶ 30.)  On February 9, 2009, Brenda Molina, a female Communications

Supervisor, issued a Letter of Instruction to Mr. Willems for an incident that occurred that day

during which Mr. Willems refused to acknowledge her directions, yelled, and slammed doors and items in the Communications Center. (*Id.*, UF ¶ 31.) On March 12, 2009, Jessica Dickman issued Mr. Willems a Letter of Warning/Intervention for an incident that occurred on March 2, 2009, during which he engaged in yet another dispute with Ms. Molina. (*See id.*, UF ¶ 32 and Ex. I (Doc. 25-4).)

Disciplinary decisions for City employees were at the discretion of the Division Manager. (Pl.'s Resp. (Doc. 25), UF ¶ 89.) Up through 2009, Mr. Willems had not been issued anything more significant than a letter of instruction for instances of conflicts with other employees and insubordination. (*See id.*, UF ¶ 90.)

On March 5, 2010, Greg Sanchez, the Communications Center Manager, issued Mr. Willems a Letter of Reprimand following Mr. Willems arguing with a male officer and calling him "ignorant." (*Id.*, UF ¶ 33.) The letter reminded Mr. Willems that anything he says that is offensive, threatening, or harassing in nature violates the City's rules and regulations and is inappropriate and unacceptable. (*Id.*)

Paul Willems began harassing Plaintiff in July 2010. (*See* Def.'s Mot. (Doc. 20), UF ¶ 2.) Mr. Willems raised his voice to Plaintiff and was constantly telling Plaintiff what to do, above and beyond what his role as an upgrade telecommunicator allowed. (*See id.*, UF ¶ 3; Pl.'s Resp. (Doc. 25), UF ¶ 3.)[1] Mr. Willems would slam his books and belongings on his desk. (Def.'s Mot. (Doc.

---

[1]The following facts are in the record but not cited by a particular party. An "upgrade" is a telecommunicator standing in as a supervisor when a supervisor is not present. (*See* Pl.'s Resp., Ex. D (Doc. 25-2) ¶ 4.) A differential pay is paid to the upgrade based on the additional duties. (*Id.*) The person assigned as the "upgrade" rotates among certain employees, depending on the shift. (*See id.* ¶¶ 6, 15.) For example, in 2010, two days out of the week, Ms. Laura Lee Sanchez would be the upgrade over both Mr. Willems and Plaintiff when no other supervisor was present; however, on certain other shifts, Mr. Willems would be the upgrade over Ms. Sanchez and Plaintiff. (*See id.*) The record is unclear as to the nature of the additional duties

20), UF ¶ 5.)  Mr. Willems would also stand behind Plaintiff and mumble.  (*Id.*, UF ¶ 6.)  Mr. Willems once commented that he could see Plaintiff's legs through her dress.  (*Id.*, UF ¶ 7.)  Ms. Laura Lee Sanchez observed that Mr. Willems seemed to fixate on Plaintiff, always asking what she was doing, when her shift was, and about her pay status, and he frequently sent Ms. Sanchez messages telling her to tell Plaintiff what to do.  (Pl.'s Resp. (Doc. 25), UF ¶ 59.)  Mr. Willems' behavior toward Ms. Torres, particularly the way he obsessed about every move Plaintiff made, caused Ms. Sanchez to wonder if he was infatuated with Plaintiff.  (*Id.*, UF ¶ 61.)  Due to the conflict between them, Rita Bibiano, a supervisor, instructed Plaintiff and Mr. Willems not to communicate to each other unless is was work related.  (*Id.*, UF ¶ 37.)

Plaintiff, Ms. Montano-Davis, and Ms. Sanchez received advertisement emails concerning "Viagra" and "penis enhancement" from Mr. Willems' personal computer on up to three different occasions.  (Def.'s Mot. (Doc. 20), UF ¶ 8 and Ex. A (Doc. 20-1) at 45-46.)  Ms. Montano-Davis brought the emails to Greg Sanchez's attention.  (*Id.*, Ex. A (Doc. 20-1) at 45-46.)  Mr. Sanchez looked into the incident, asking Mr. Willems about it.  (*Id.*)  Mr. Sanchez also had an IT person with the City look into it.  (*Id.*)  Based on the IT person's representations, the supervisors understood that Mr. Willems' computer had a virus that caused the spam emails to be sent.  (*See id.*; Def.'s Reply, Ex. I (Doc. 29-1) at 44-45.)

On August 15, 2010, Mr. Willems was asking Plaintiff directly for information, contrary to Ms. Bibiano's directive.  (Pl.'s Resp. (Doc. 25), UF ¶ 38.)  When Plaintiff did not answer, Mr. Willems first raised his voice and repeated his question about what line the call was on.  (*Id.*)

---

assigned to an upgrade.  The ability to discipline another co-worker, however, is not part of an upgrade's authority; only a supervisor had the authority to discipline.  (*See* Pl.'s Resp., Ex. B (Doc. 25-1) at 48-49.)

Plaintiff ignored him, but Mr. Willems' aggressiveness escalated and he began yelling at her and moved his chair closer to her, leaning forward aggressively. (*Id.*) When Plaintiff finally spoke to him, Mr. Willems stood up, caused his chair to bang into the desk, clenched his fists at his sides, screamed at her, grabbed her chair, and stood face-to-face with her, close enough that she could feel his breath, although he did not physically touch her. (*See* Def.'s Mot. (Doc. 20), UF ¶ 4 and Ex. A (Doc. 20-1) at 23-24; Pl.'s Resp. (Doc. 25), UF ¶ 38.) Ms. Laura Lee Sanchez, who was acting as the upgrade that shift, had to step between them, and she sent Mr. Willems out of the room to cool down, after which Plaintiff collapsed in her chair crying. (Pl.'s Resp. (Doc. 25), UF ¶ 38 and Ex. D (Doc. 25-2) ¶¶ 6-15.) This incident caused both Plaintiff and Ms. Sanchez to fear for their safety. (Pl.'s Resp. (Doc. 25), UF ¶ 38.) )

On August 17, 2010, Plaintiff complained in an email to Ms. Montano-Davis that Mr. Willems was creating a hostile work environment. (Def.'s Mot. (Doc. 20), UF ¶ 15.) Plaintiff also verbally complained about Mr. Willems' harassment to Mr. Sanchez, who advised to try not to escalate situations with Mr. Willems and to try to have as little interaction with him as possible. (*See* Pl.'s Resp. (Doc. 25), UF ¶ 63.) On August 18, 2010, Ms. Montano-Davis issued Mr. Willems a Notice of Investigation concerning the allegation of harassment and unprofessional conduct made by Plaintiff. (Def.'s Mot. (Doc. 20), UF ¶ 16; Pl.'s Resp. (Doc. 25), UF ¶ 43.) At the time of the incident, Ms. Montano-Davis asked her supervisor, Greg Sanchez, if the City could issue a protective order for Plaintiff against Mr. Willems. (Pl.'s Resp. (Doc. 25), UF ¶ 71.)

Ms. Montano-Davis investigated the claims made by Plaintiff in the August 2010 email. (Def.'s Mot. (Doc. 20), UF ¶ 17.) On September 1, 2010, Ms. Montano-Davis issued a Notice of Supervisory Investigation Findings, finding that Mr. Willems "was disruptive, verbally abusive and verbally violent during an altercation that he provoked with Mrs. Ramona Torres." (Pl.'s Resp., Ex.

5

O (Doc. 25-4).)   She further found that "Mr. Willems has been unprofessionally using his supervisory upgrade status as a way to intimidate and repeatedly harass Mrs. Torres."   (*Id.*)   She noted that, prior to this incident, Mr. Willems requested his upgrade status to be reinstated so he could "tell Ramona what to do."   (*Id.*)   Ms. Montano-Davis recommended that Mr. Willems be removed from the swing shift to protect the individuals involved from further victimization and retaliation from Mr. Willems.   (*Id.*)   On September 3, 2010, another supervisor concurred with the findings, recommending a two- to three-day suspension without pay and a fitness for duty evaluation.   (*See id.*)

Mr. Willems, however, continued to work with Plaintiff from August 15, 2010, through October 2010.   (*See* Pl.'s Resp. (Doc. 25), UF ¶ 18.)   For several months, the City continued to allow Mr. Willems to be the upgrade on certain shifts and to work with Plaintiff and Ms. Sanchez without a supervisor present.   (*See id.*, UF ¶ 39.)   During this time, Ms. Sanchez witnessed the following behavior by Mr. Willems towards Plaintiff: he would antagonize and mock her; he would aggressively crumple papers either within a foot of her face or right behind her to make her jump, and then laugh when she jumped; he would stand right behind her and drum his fingers to let her know he was there; he would go out of his way to walk near her during shift changes; he would clear his throat loudly and excessively near her for a protracted period of time; at shift change, he would make it a point to sit in the seat she had been sitting in even though there were other available desks and she often moved her seat several times; a couple of times, while waiting for her to leave her desk, he would move her items and put his items down.   (*Id.*, UF ¶ 50.)   When Mr. Willems was the upgrade, he would try to give her duties she should not have been assigned, and he would gloat that he could tell her what to do.   (*Id.*, UF ¶ 86.)

Ms. Sanchez notified the Sergeant and all uniformed officers to listen to the police radio for

her to scream a code if there was a physical threat or violence in the Communications Center.  (*Id.*, UF ¶ 40.)  Ms. Montano-Davis similarly created the code to use to get help from Aviation police. (*Id.*)  Plaintiff began having an officer escort her to her car due to her fear of Mr. Willems.  (*Id.*, UF ¶ 41.)  Five other female employees had expressed fear for their safety: Ms. Montano-Davis, Ms. Sanchez, Sidney Sice, Sybille Subiano, and Brenda Molina.  (*See id.*, UF ¶ 72 and Ex. C (Doc. 25-2) at 57-58.)  Around this time, one night when Mr. Willems left and Plaintiff was waiting for an officer escort, she saw Mr. Willems on camera park his car behind her car and wait there for about 10 minutes before driving away.  (Pl.'s Resp. (Doc. 25), UF ¶ 42.)

On September 20, 2010, James Hinde, Director of the Aviation Department, submitted a request to Human Resources that Mr. Willems undergo a Fitness for Duty examination due to Mr. Willems' display of "extreme cases of anxiety, aggressive anger, and outbursts toward his coworkers in the Communication Center."  (*Id.*, UF ¶ 34.)  At some point in time, Plaintiff had also notified Mr. Hinde about her problems with Mr. Willems' behavior.  (*See id.*, UF ¶ 83.)  She notified Mr. Hinde because she did not feel that Mr. Sanchez cared or was taking sufficient action to end Mr. Willems' harassment.  (*See id.*, UF ¶ 84.)

On October 19, 2010, Ms. Sanchez sent an email to Ms. Montano-Davis and Greg Sanchez describing eight days in October involving inappropriate and threatening actions by Mr. Willems. (*See id.*, UF ¶ 47.)  Based on this email, Ms. Montano-Davis requested an administrative transfer of Mr. Willems to remove him from the Communications Center, but he was not transferred.  (*See* Pl.'s Resp. (Doc. 25), UF ¶ 73.)  On October 25, 2010, however, Mr. Willems was notified of his three-day suspension as discipline concerning the allegations that he was verbally abusive to Plaintiff.  (*See* Def.'s Mot. (Doc. 20), UF ¶ 18; Pl.'s Resp., Ex. P (Doc. 25-4).)

At some point around November 2010, Mr. Willems attempted to make a false police report

7

against Plaintiff, claiming that she had caused damage to his car that was not substantiated by the video evidence.  (*See* Pl.'s Resp. (Doc. 25), UF ¶ 51 and Ex. A (Doc. 25-1) ¶ 13.)  Due to Mr. Willems behavior toward her until November 2010, Plaintiff felt very stressed, saw a counselor, and even lost some of her hair.  (Pl.'s Resp. (Doc. 25), UF ¶ 64.)  Ms. Montano-Davis noticed the physical and emotional stress on Plaintiff caused by Mr. Willems working with Plaintiff, and observed that the stress affected Plaintiff's work performance.  (*Id.*, UF ¶ 68.)

Mr. Willems served his suspension on November 7, 8, and 11, 2010. (*See* Pl.'s Resp., UF ¶ 48 and Ex. P (Doc. 25-4).)  The City then placed Mr. Willems on administrative leave from November 2010 through March 2011.  (Def.'s Mot. (Doc. 20), UF ¶ 19.)

In November 2010, after Mr. Willems was put on administrative leave and instructed not to come on the premises, Plaintiff advised Greg Sanchez that she did not feel safe because of Mr. Willems' knowledge of the airport security and how to get into the secure areas, and she requested a transfer.  (Pl.'s Resp., Ex. A (Doc. 25-1) ¶ 17.)  Michelle Rallis told Plaintiff that she thought Plaintiff was blowing out of proportion what was going on between her and Mr. Willems, because Ms. Rallis did not believe Plaintiff needed to be fearful for her safety while Mr. Willems was on administrative leave.  (*See id.*, Ex. F (Doc. 25-3) at 40-41.)  Plaintiff expressed her fear of Mr. Willems returning to work and resuming his behavior to Ms. Montano-Davis, and she believed Plaintiff's fears were justified.  (Pl.'s Resp. (Doc. 25), UF ¶ 65.)

On November 30, 2010, Mr. Hinde issued to the Director of Human Resources a Request for In-Service Behavioral Fitness for Duty Examination for Mr. Willems because of his "aggressive and angry behavior."  (*Id.*, Ex. L (Doc. 25-4).)  Mr. Hinde stated that Mr. Willems "is confrontational, mostly toward female co-workers," and he cited the incident in which Mr. Willems falsely accused Plaintiff of hitting and causing damage to his vehicle.  (*Id.*)  Mr. Hinde noted that

Mr. Willems yells and screams at supervisors and has exhibited aggressive behavior towards them. (*Id.*)  The fitness for duty evaluation was not completed until January 5, 2011.  (Pl.'s Resp. (Doc. 25), UF ¶ 36.)  The evaluation recommended a shift change and ongoing counseling.  (*Id.*)

Mr. Willems returned to work when he cleared the fitness for duty examination that included a behavioral and psychological examination.  (Def.'s Mot. (Doc. 20), UF ¶ 20.)  Upon notification that Mr. Willems was returning to work and in light of his past disruptive behavior, Ms. Montano-Davis requested cameras be put in the Communications Center, which the City did.  (*See* Pl.'s Resp. Ex. C (Doc. 25-2) at 68-69.)

In order to avoid working with Mr. Willems upon his return from administrative leave, Plaintiff requested a transfer on or about January 18, 2011.  (Def.'s Mot. (Doc. 20), UF ¶ 21.)  In the letter requesting a transfer, Plaintiff explained that she felt "unsafe in this hostile environment" caused by Mr. Willems' fixation on her and the emotional stress he causes her through his anger and outbursts.  (*See* Pl.'s Resp., Ex. Z (Doc. 25-5).)  She stated that she felt he was going to retaliate against her and her family and noted that she was relocating her family due to the situation with Mr. Willems.  (*Id.*)  At some point, Plaintiff indeed moved her home and refused to give the City her new address.  (*See id.*, Ex. C (Doc. 25-2) at 56.)  Michelle Rallis, the Personnel Officer for the Aviation Department, initially told Plaintiff that there was no place for her to transfer, even though Plaintiff had applied for some open positions.  (*See* Pl.'s Resp. (Doc. 25), UF ¶ 89 and Ex. A (Doc. 25-1) ¶ 26.)

On March 1, 2011, Plaintiff made a formal EEOC Charge of Discrimination, alleging retaliation and discrimination on the basis of sex.  (Def.'s Mot., Ex. A-2 (Doc. 20-1) ("Charge of Discrimination").)  Plaintiff stated:  "Since August 2010, I have been on a continuous basis being harassed by a male co-worker, to include but limited to being argumentative and trying to be the

9

boss. . . . I'm afraid of what this individual could do to me or others as they have complained as well." (*Id.*)

On March 18, 2011, Plaintiff requested a transfer to the vacant Administrative Assistant position with Marshall Katz, Aviation Police Chief. (Pl.'s Resp., Ex. A (Doc. 25-1) ¶ 29.) On March 21, 2011, Plaintiff was temporarily reassigned to assist Chief Katz. (Def.'s Mot. (Doc. 20), UF ¶ 22.) The temporary reassignment lasted approximately 30 days. (*Id.*, UF ¶ 23.)

After the temporary transfer, Plaintiff has continued to request a permanent transfer and has applied for many open City positions, but she has not been placed in any. (*See* Pl.'s Resp., Ex. A (Doc. 25-1) ¶¶ 40, 45.) She applied to a variety of clerical supervisory jobs in a variety of different departments with the City, including applying for one of her former jobs at the airport. (*See* Pl.'s Resp. (Doc. 25), UF ¶ 87 & Ex. B (Doc. 25-1) at 40-41.) She has never been given a specific reason for not being selected for any of the positions. (*Id.*) Mr. Hinde had mentioned a possible transfer to Plaintiff but the transfer did not occur. (*See id.*, UF ¶ 88 and Ex. A (Doc. 25-1) ¶¶ 24-26.) Michelle Rallis with Human Resources explained to Plaintiff in a meeting that she did not have priority and there was nowhere to place her. (*Id.*, Ex. A (Doc. 25-1) ¶ 26.)

On April 28, 2011, Plaintiff filed suit in this court against the City asserting claims for employment discrimination on the basis of her sex and retaliation under Title VII based on her co-worker's harassment. (Compl. (Doc. 1).) Plaintiff alleges that the City discriminated against her on the basis of her sex by allowing a hostile work environment to continue, allowing Mr. Willems to return to work, and forcing Plaintiff to seek a transfer to avoid the hostile work environment. (*Id.* ¶¶ 31-35.) She also asserts that the City has unlawfully retaliated against her by refusing to transfer her following her complaints to supervisors concerning Mr. Willems' harassment. (*Id.* ¶¶ 39-41.)

On May 10, 2011, Plaintiff was transferred back to the Communications Center on swing

shift.  (Pl.'s Resp., Ex. A (Doc. 25-1) ¶ 35.)  Plaintiff was absent from work for health reasons in

May and June 2011 due to a gallbladder issue.  (Def.'s Mot. (Doc. 20), UF ¶ 25 and Ex. A (Doc. 20-

1) at 39.)  At the time Plaintiff returned to work at the Communications Center, Mr. Willems was

working graveyard and Plaintiff was concerned she would encounter him at the shift change.  (*See*

Pl.'s Resp., Ex. A (Doc. 25-1) ¶¶ 35-39.)  In July and August 2011, Plaintiff asked to work from

2:00 to 10:00 to prevent her from having any contact with Mr. Willems, which the City did for a

little while.  (*See* Def.'s Mot., Ex. A (Doc. 20-1) at 39; Pl.'s Resp., Ex. A (Doc. 25-1) ¶ 37.)

Plaintiff also chose to use an hour of vacation each day so that she would not have any contact with

him at the shift change.  (Pl.'s Resp., Ex. A (Doc. 25-1) ¶ 36.)

        Mr. Willems started taking overtime to work swing shift.  (*Id.* ¶ 38.)  Sometime in June 2011,

Greg Sanchez told Plaintiff she was assigned mandatory graveyard overtime with Mr. Willems and

would have had to work alone with him one night.  (*Id.* ¶ 39.)  Plaintiff said she could not work with

him, but Mr. Sanchez's response was that he expected her to come into work, do her job, and be

professional, and that they both needed to get over and move on from the issues between them.  (*Id.*)

Plaintiff used FMLA leave rather than working with Mr. Willems.  (*Id.*)

        The City did not prevent Mr. Willems from working overtime on the swing shift, so Plaintiff

would use her vacation time to avoid him.  (*Id.* ¶ 38.)  Plaintiff took approximately four shifts of her

personal leave to avoid Mr. Willems.  (*Id.* ¶ 43.)  The City placed Mr. Willems on administrative

leave again in July 2011.  (Def.'s Mot. (Doc. 20), UF ¶ 27.)  Consequently, Plaintiff had no contact

with Mr. Willems in April, May, and June 2011.  (Def.'s Mot., Ex. A (Doc. 20-1) at 38-39.)

Plaintiff had minimum to no contact with Mr. Willems in July and August 2011.  (*Id.*)

        In May 2011, Ms. Laura Lee Sanchez sent an email to Ms. Montano-Davis complaining

about Mr. Willems behavior while he worked overtime on the swing shift.  (*See* Pl.'s Resp., Ex. C

at 63-64.)  On May 12, 2011, Greg Sanchez sent an email notifying Human Resources that Mr. Willems' upgrade status had been rescinded due to, among other reasons, Mr. Willems raising his voice with other female co-workers.  (Pl.'s Resp. (Doc. 25), UF ¶ 53.)  On June 25, 2011, Ms. Laura Lee Sanchez notified Ms. Montano-Davis that, in light of the last interaction between Mr. Willems and Plaintiff and Mr. Willems' behavior toward Ms. Sanchez, she would be using a tape recorder on the swing shift because both Mr. Willems and Plaintiff would be working with her.  (*Id.*, UF ¶ 54.)  On June 26, 2011, Plaintiff notified her supervisors that she was uncomfortable after witnessing Mr. Willems checking her timecard and learning that he had been asking a lot of questions about what time she was working and what type of leave she had taken.  (*Id.*, UF ¶ 55.) Ms. Montano-Davis was concerned that Mr. Willems was targeting Plaintiff and she expressed this concern to Greg Sanchez, who said he would talk to him, and he spoke to Brenda Molina, Mr. Willems' supervisor, about it.  (*See id.*, UF ¶ 77 & Ex. C (Doc. 25-2) at 70-71.)

On July 7, 2011, around the swing shift to graveyard shift transition, Mr. Willems slammed his books behind Plaintiff, got into the face of Ms. Montano-Davis, and aggressively yelled at her while she was on a call.  (Pl.'s Resp., UF ¶ 56 and Ex. V (Doc. 25-4).)  Plaintiff left the room because she was afraid of him.  (*See id.*)

On July 12, 2011, Laura Lee Sanchez sent an email to her manager, Greg Sanchez, and to her supervisors, Ms. Montano-Davis, Brenda Molina, and Rita Bibiano, notifying them that the past week Mr. Willems puts his belongings near Plaintiff's work area, stands behind her until she moves, stands right by her and strums his fingers, crumples papers directly behind her, moves chairs around, or clears his throat to make his presence known.  (Pl.'s Resp. (Doc. 25), UF ¶ 57.)  Mr. Willems would sometimes come in early before his shift and sit right behind Plaintiff in an intimidating manner, even though there were other open seats.  (*See id.*, UF ¶ 75.)  On July 24, 2011, Plaintiff

sent an email to Greg Sanchez complaining about Mr. Willems' harassment of her and of "a hostile environment," detailing the actions Mr. Willems takes to make his presence known to her in a bullying way, and how his actions cause her to feel uncomfortable, afraid, and nervous.  (*See id.*, UF ¶ 58.)  She requested generally that a solution be resolved quickly for all involved.  (*Id.*)

In July 2011, Mr. Willems was again placed on administrative leave pending a hearing for an incident of insubordination.  (*See* Pl.'s Resp. (Doc. 25), UF ¶ 80 and Ex. C (Doc. 25-2) at 76-77.) Ms. Montano-Davis requested a police escort for when he was notified about the administrative order.  (*Id.*)  Mr. Willems acted aggressively toward the Sergeant, who was giving him a verbal directive not to return to the airport unless it was business-related.  (*See* Pl.'s Resp., Ex. C (Doc. 25-2) at 76-77.)  Mr. Willems butted up against the Sergeant, chest to chest, grabbed the paper that was in his hand, and said, "This is what that says," shaking the paper in the Sergeant's face.  (*Id.*)

Mr. Willems did not return from administrative leave and the City terminated his employment on or about September 14, 2011.  (Def.'s Mot. (Doc. 20), UF ¶ 28.)  In Ms. Montano-Davis' opinion, it took a longer time than it should have for Mr. Willems to be fired.  (Pl.'s Resp. (Doc. 25), UF ¶ 79.)  The City has a zero-tolerance policy for violence in the work place, and according to Michelle Rallis, Mr. Willems' violent actions towards Plaintiff on August 15, 2010, could have justified his termination under that policy for that incident alone.  (*See id.*, UF ¶ 92.)

## II.    STANDARD

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the

light most favorable to the nonmoving party." *Id.* (internal quotations omitted).  Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists.  *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial.  *Id.*  The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *See Anderson*, 477 U.S. at 248.

## III.    ANALYSIS

### A.    Hostile Work Environment

Plaintiff alleges that Defendant discriminated against her on the basis of her sex by allowing a hostile work environment to continue and, after being notified of the hostile environment, failing to take reasonable steps to end it.  The City contends that it is entitled to summary judgment on Plaintiff's claim for hostile work environment because (1) Plaintiff cannot present sufficient evidence that the harassment was on the basis of her sex and was severe and pervasive, and (2) the City did not fail to take reasonable steps to end the hostile work environment.  The Court does not need to reach the question of whether the harassment was based on sex, because even assuming it were, the City is nonetheless entitled to summary judgment because the facts, construed in

14

Plaintiff's favor, show that the City, when notified of the incidents of harassment, took prompt, reasonable measures in an attempt to prevent further harassment, and ultimately, ended the harassment by terminating Mr. Willems' employment.

Title VII prohibits discrimination by an employer "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). "Title VII's prohibition of employment discrimination based on sex encompasses hostile work environment sexual harassment." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). To establish the existence of a sexually hostile work environment, Plaintiff must prove: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to its severity or pervasiveness, the harassment altered a term, condition or privilege of her employment and created an abusive working environment. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007). Even if a plaintiff satisfies all four elements, the plaintiff must also identify one of three alternative bases for holding her employer liable under Title VII. *Id. See also Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000) ("To survive summary judgment under Title VII, the record must support an inference of a [sexually] hostile work environment *and* a basis for employer liability.") (Emphasis in original).

The basis for employer liability alleged in this case is Defendant's negligence in allowing a fellow employee, Mr. Willems, to engage in sexual harassment.[2] Under the negligence theory of

---

[2]Plaintiff, in her complaint and response, asserts that the City is liable for failing to take reasonable steps to correct the hostile work environment, a theory of liability based on employer negligence. In her response, Plaintiff cites to the case of *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). *Faragher* established respondeat superior liability, holding an employer vicariously liable to a victimized employee for a hostile work environment created by a supervisor with immediate or successively higher authority over the employee. *See id.* at 807.

15

employer liability, "the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Adler*, 144 F.3d at 673 (quoting *Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1444 (10th Cir. 1997)).  Employer negligence is failing to remedy or prevent a hostile work environment of which management-level employees knew, or in the exercise of reasonable care should have known.  *Id.* (quoting *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 (10th Cir. 1990)).  A plaintiff establishes actual knowledge where there is evidence she reported the harassment to management-level employees.  *Id.*

The touchstone of an employer's response is reasonableness.  *Id.* at 675-76.  The test in the Tenth Circuit is "whether the remedial and preventative action was reasonably calculated to end the harassment." *Id.* at 676 (internal quotation omitted).  *See also Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1148 (10th Cir. 2008).  The Tenth Circuit outlined what reasonable actions are expected of employers as follows:

> A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation.  However, this is not the sole factor to be considered.  Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist.
>
> In cases where effectiveness is not readily evidenced by a stoppage, we consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment. . . .

---

Although Plaintiff cites to *Faragher*, the Court construes her argument as being based on a negligence theory of liability.  Plaintiff does not argue anywhere in her brief that Mr. Willems was a supervisor or management-level employee.  In the complaint, Plaintiff repeatedly refers to Mr. Willems as a "co-worker," not a supervisor or manager.  (*See* Compl. (Doc. 1) ¶¶ 11-12, 14-15.)  Plaintiff's response also does not indicate that she intends to assert a different theory of liability or desires to amend her complaint.  The Court therefore finds that Plaintiff has only asserted a negligence theory of liability and will limit its analysis to such.

The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective.  Repeat conduct may show the unreasonableness of prior responses.  On the other hand, an employer is not liable, although a perpetrator persists, so long as each response was reasonable.  It follows that an employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to the end the harassment.

*Adler*, 144 F.3d at 676 (internal citations omitted).

Plaintiff argues that the City unduly delayed in its responses to her complaints and in firing Mr. Willems.  She also complains about having to use her own leave in order to avoid all contact with Mr. Willems.  The record in this case, however, shows considerable, reasonable, and repeated actions by the City to progressively discipline Mr. Willems in an effort to end Mr. Willems' harassment.

In response to Ms. Montano-Davis's complaint to Mr. Sanchez in July 2010 regarding the Viagra emails, Mr. Sanchez investigated the incident, talked to Mr. Willems about it, and had an IT person with the City look into it.  In light of the IT person's representations that a virus had infected Mr. Willems' computer and caused the spam emails to be sent, the City acted reasonably in not disciplining Mr. Willems over the incident for which it appeared he did not cause and had no control.  Following this incident, Plaintiff never received any additional emails with sexual content from Mr. Willems.

Plaintiff next complained to the City about Mr. Willems on August 17, 2010, following the incident in which he yelled at her and behaved aggressively toward her.  The City promptly investigated her complaint, resulting in recommendations made by two supervisors in early September 2010 that Mr. Willems be disciplined for the incident.  Mr. Willems and Plaintiff continued to work together, however, from September through October 2010, and he continued to

engage in harassing conduct toward Plaintiff.  The City, however, disciplined Mr. Willems for his violent outburst by suspending him for three days.  It is unclear from the record why Mr. Willems did not serve his suspension until early November 2010.[3]  However, following his three-day suspension, the City placed Mr. Willems on administrative leave from November 2010 until March 2011, and required him to complete a Fitness for Duty evaluation before allowing him to return to work.  It is unfortunate that Plaintiff had to endure any harassing conduct from Mr. Willems during those two months while the disciplinary process worked its course, but a 2 ½ month delay from complaint to punishment does not appear excessive in light of the City's obligation to ensure that both the victim's rights, the employer's rights, and the alleged harasser's rights are protected during the process.

The City also acted reasonably in allowing Mr. Willems to return to work after he passed a Fitness for Duty evaluation.  It is reasonable for the City, under these circumstances, to give an offending employee, after progressive discipline, an opportunity to prove that he has reformed.  The City also responded reasonably to Plaintiff's concerns about working with Mr. Willems during this time.  The City made many efforts to reduce their contact.  The City granted Plaintiff a temporary transfer to another position for a month in March 2011.  Although Plaintiff was transferred back to the Communications Center in May 2011, due to a gallbladder issue, Plaintiff was out for health reasons in May and June 2011.  Plaintiff therefore had no contact with Mr. Willems from November 2010 through June 2011.  The City also responded to Plaintiff's concerns by assigning Plaintiff a different shift from Mr. Willems when she returned to work.  The City also allowed her for a time

---

[3]The City mentions in its motion that, after issuing Mr. Willems a Notice of Investigation, it "followed up with a predetermination hearing."  (Def.'s Mot. (Doc. 20) at 10.) The City cites to no evidence in the record, however, to support this fact.

to alter her shift time by an hour to avoid contact with Mr. Willems during the shift change.

There were, however, times during July and August 2011 when the City permitted Mr. Willems to work an overtime shift that would cause him to work with Plaintiff. Plaintiff chose to use her leave to avoid working with Mr. Willems during such shifts on around four occasions. She also used an hour of leave at times to avoid seeing Mr. Willems at some shift changes. The City, however, put Mr. Willems on administrative leave again in August 2011 and terminated his employment in September 2011. Consequently, the period during which the City at times would have permitted Mr. Willems to work with Plaintiff had she not chosen to take leave was between one and two months. The Court finds, as a matter of law, that the City's actions, individually and as a whole, were reasonable. The City was not required to terminate Mr. Willems immediately or to avoid any and all contact between Mr. Willems and Plaintiff. As the Tenth Circuit lamented,

> [u]nfortunately, some harassers may simply never change. Just as unfortunate, a victim may have to suffer repeated harassment while an employer progressively disciplines the perpetrator to determine whether he or she is just such a "hard head" case. It is some consolation for the victim that, to be reasonable, responses must progress more rapidly in proportion to more serious and frequent harassment.

*Adler*, 144 F.3d at 676-77 .

In this case, the City responded to complaints by Plaintiff and others by investigating the complaints and by imposing progressive discipline that went from letters of reprimand, to a temporary suspension, to forced administrative leave, and ultimately, to termination. These are exactly the types of responses that the Tenth Circuit expects of employers and has held are reasonable. *See id.* at 676 ("By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including

suspension and termination."). When it became apparent that Mr. Willems represented the type of "hard head" case who would or could not stop his harassment, the City terminated his employment. That it took a little more than a year from Plaintiff's first complaints of harassment to when the City terminated Mr. Willems reflects not an unreasonable response by the City, but rather, the realities of the constraints of the City in needing to respect the harasser's rights to ensure that any discipline it administered was lawful. As the Tenth Circuit explained: "The courts . . . must balance the victim's rights, the employer's rights, and the alleged harasser's rights. If our rule were to call for excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination." *Id.* at 677. Until the City progressed to terminating Mr. Willems, it took numerous actions to accommodate Plaintiff to avoid her working with Mr. Willems during this period of progressive discipline. The actions the City took were reasonable as a matter of law and the City is entitled to summary judgment on Plaintiff's Title VII hostile work environment claim.

### B.     Retaliation

In Count II of her Complaint, Plaintiff alleges that, in violation of Title VII, the City retaliated against her for engaging in protected conduct by subjecting her to adverse employment actions, to wit, refusing her request for a transfer. The City argues that Plaintiff requested her transfer before filing her formal EEOC Complaint, and thus, the City could not have retaliated against her before her protected activity occurred. The City also argues that a transfer was unnecessary to keep Plaintiff and Mr. Willems from working together and that there were no other available positions, so the failure to transfer her permanently did not amount to retaliation.

Title VII prohibits retaliation against employees who voice opposition to, or participate in an investigation or proceeding alleging, an unlawful employment practice by his or her employer.

20

*See* 42 U.S.C. § 2000e-3(a).   To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and, (3) a causal nexus exists between her opposition and the employer's adverse action.   *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). Should Plaintiff succeed in proving a *prima facie* case, the City must provide a legitimate and facially non-discriminatory reason for its decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the City satisfies this burden, Plaintiff must then establish that the City's reasons were a pretext for discrimination.  *Id*. at 804.  Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of belief and thus infer that the employer did not act for the asserted non-discriminatory reasons.  *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir. 1997).

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the United States Supreme Court held that to establish an "adverse action" in the context of a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. at 68 (internal quotations omitted).  The intent of this standard is to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."  *Id*. at 70.

This Court concludes as a matter of law that Plaintiff has not provided sufficient evidence to establish a prima face case of retaliation.  Plaintiff had no change in title, pay or benefits, nor was she disciplined, suspended or reprimanded in any way.  Nor has Plaintiff argued a failure to promote

her.  Instead, Plaintiff argues that she was not transferred because she complained about the harassment.  However, Plaintiff's reason for the transfer request was solely to avoid the alleged harassment.  The City, as discussed above, took reasonable steps to accommodate Plaintiff and to minimize any contact between her and Mr. Willems, and ultimately, the City terminated Mr. Willems, negating the reason behind Plaintiff's transfer request.  The City's actions, viewed from the perspective of a reasonable person in Plaintiff's position during the time period involved, would not have dissuaded a reasonable worker from making or supporting a charge of discrimination.  The record in this case shows that the City took Plaintiff's allegations of harassment seriously, imposing progressive discipline of Mr. Willems that resulted in his termination.  There is no evidence of retaliatory intent by the City in its failure to permanently transfer Plaintiff.  Moreover, the City granted Plaintiff a temporary transfer, undermining her contention that the failure to grant her a permanent transfer resulted from her protected activity.  Plaintiff thus cannot show that she suffered an adverse employment action caused by her protected activity.  *See Mitchell v. Vanderbilt University*, 389 F.3d 177, 183 (6th Cir. 2004) ("Non-selection for a position of employment is not always an adverse employment action.  In cases where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action.").  The City is therefore entitled to summary judgment on Plaintiff's Title VII retaliation claim.

    **IT IS THEREFORE ORDERED** that Defendant City of Albuquerque's Motion for Summary Judgment and Memorandum of Law in Support (**Doc. 20**) is **GRANTED** and Plaintiff's case is **DISMISSED WITH PREJUDICE**.

_____
SENIOR UNITED STATES DISTRICT JUDGE